# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF KANSAS

LYLE AND RACHELL SUHR,

        *Plaintiffs,*

  vs.

AQUA HAVEN, LLC, and
MASTER SPAS, INC.,

        *Defendants.*

Case No. 11-1165-EFM

## MEMORANDUM AND ORDER

In this case, Plaintiffs Lyle and Rachell Suhr assert claims against Defendants Aqua Haven, LLC, and Master Spas, Inc., alleging breach of express and implied warranty, breach of contract, negligence, violation of the Magnuson-Moss Warranty Act,[1] and violation of the Kansas Consumer Protection Act ("KCPA").[2] This matter comes before the Court on the cross-motions for summary judgment filed by Plaintiffs (Doc. 46) and Defendants (Docs. 42 & 44). For the reasons stated herein, the Court denies Plaintiffs' motion. Defendants' motions are granted in part and denied in part.

---

[1] 15 U.S.C. § 2301, *et seq.*

[2] Kan. Stat. Ann. § 50-623, *et seq.*

# I. Factual and Procedural Background[3]

Plaintiffs Lyle and Rachell Suhr are residents of Sedgwick County, Kansas. Defendant Master Spas, Inc. ("Master Spas") is an Indiana corporation that manufactures personal home spas that are sold throughout the United States by various dealers. Defendant Aqua Haven, LLC ("Aqua Haven") is an Oklahoma limited liability company that sells personal home spas, including those manufactured by Master Spas.

## A. Plaintiffs' Purchase and Acceptance of the Spa Unit

After enjoying more than five years of flawless performance from a Master Spas product, Plaintiffs decided in December 2009 to replace their current spa with a new Master Spas unit. An internet search on Master Spas's website revealed that Aqua Haven, located in Oklahoma City, Oklahoma, was a Master Spas dealer serving Kansas residents. Accordingly, Plaintiffs arranged to meet with Aqua Haven sales personnel at their Oklahoma City location on December 5, 2009. During this visit, Plaintiffs met with Aqua Haven salesman, Maurice Gordon, who showed Plaintiffs several spas and explained that all Master Spas units were covered by an express warranty. Plaintiffs allege that they had some reservations about buying a spa from a distant seller, but Gordon assured Plaintiffs that the dealer could generally respond to a warranty service call within two or three days. Defendants deny that Gordon made such a representation.

During this meeting on December 5, 2009, Gordon provided Plaintiffs with some literature, including a two-page document from Master Spas, entitled "Limited Warranty." The warranty provided that "Master Spas, Inc. warrants to the original retail Purchaser that the Spa Side Equipment Pack (2 pumps, heater, control system) to be free [sic] from defects in material

---

[3] In accordance with the procedures for summary judgment, the facts set forth herein are uncontroverted for the purposes of the present motions before the Court. If controverted, the facts are related in the light most favorable to the party opposing summary judgment.

and workmanship for a period of five (5) years from the date of the original retail purchase. (Parts and labor)."[4] The document expressly provides that "[l]ight bulbs, light lenses, fuses, covers, swim spa pillows or any dealer installed accessories are specifically excluded from this limited warranty."[5] Finally, in explaining the process for enforcing the warranty, the document provides that "[i]f it is determined that the malfunction or defect is covered under this limited warranty, Master Spas, through its dealer, or authorized representative will repair or replace the covered item."[6]

After viewing some Master Spas literature, Plaintiffs became interested in a Master Spas Momentum XP H2X Swim Spa model that was not on display in Aqua Haven's Oklahoma City location. Accordingly, on December 5, 2009, Plaintiffs and Gordon drove to Dallas, Texas, to inspect a swim spa unit. After seeing the examples in person, Plaintiffs decided to purchase the Master Spas swim spa model for $35,548.00, which Aqua Haven would deliver when Plaintiffs completed construction of a spa structure on their property. Gordon filled out a standardized order form that set forth general terms and conditions along with the particular features and options that Plaintiffs desired.[7] That order form reflects that on December 5, 2009, Plaintiffs used a credit card to make a $10,000.00 down payment.

The words "Acceptance of Agreement" appear near the bottom of the order form, immediately above signature blocks for the "Buyer," "Salesperson," and "Manager."[8] Gordon signed the Acceptance of Agreement on the signature line designated for a salesperson.

---

[4] Master Spas Warranty, Pl.'s Ex. 8, Doc. 47-8, at 2.

[5] *Id.* at 3.

[6] *Id.*

[7] Order Form, Pl.'s Ex. 3, Doc. 47-3, at 2.

[8] *Id.*

However, no signatures appear on the lines designated for the buyer or the manager. Immediately below these signature lines for the Acceptance of Agreement, the order form provides, "By signing the buyer accepts all terms and conditions stated on the front and back of this agreement."[9]  Plaintiffs did not sign the order form as "Buyer" when they agreed to purchase the spa on December 5, 2009.

Later in December 2009, Gordon sent Plaintiffs a second order form to reflect a price reduction of $650.00 related to an unnecessary water heater.  On this second order form, Gordon wrote the word "sign" and drew an arrow pointing to the signature block for "Buyer" under the Acceptance of Agreement.  Plaintiffs received the second order form and acknowledged the price reduction, but they did not sign and return the document, and Aqua Haven did not demand that it be signed and returned.  On April 14, 2010, Plaintiffs accepted delivery of the new spa at their residence in Valley Center, Kansas.  Upon delivery, Rachell Suhr signed the very bottom of the order form on a line next to the words, "Received by."[10]

**B.  Plaintiffs' Complaints Regarding the Spa Unit**

On or around May 1, 2010, Lyle Suhr installed the spa and Plaintiffs used it several times per week for three weeks.  Plaintiffs initially had difficulty getting the spa controls to indicate the correct time of day or to perform the filter function in the early morning hours when it was not in use.  In early May 2010, Aqua Haven agreed to have some of its employees assist Plaintiffs, but they were ultimately unable to properly program the spa's early morning filtration function.

On May 28, 2010, Plaintiffs noticed that the spa had no electrical power because two internal fuses had malfunctioned.  On June 7, 2010, Plaintiffs replaced the spa's internal fuses, but smelled smoke coming from the spa when they turned the power on.  Several days later,

---

[9] *Id.*

[10] *Id.*

Plaintiffs called Aqua Haven to report the problem and to request service. On June 25, 2010, an Aqua Haven employee traveled to Plaintiffs' residence and replaced part of the spa's propulsion system covered under the unit's equipment warranty.

In early August 2010, Rachell Suhr noticed that when she sat on the spa side of the unit, the water level would dramatically drop several inches while the swimming side of the unit would experience changes in water levels and temperatures. Plaintiffs reported this problem to Aqua Haven on August 2, 2010. On September 29, 2010, Aqua Haven employee Ryan Frank advised Rachell Suhr that the water-level and temperature fluctuations she experienced were normal. Rachell Suhr was skeptical of Frank's conclusion, so in October 2010, she called the Master Spas plant in Indiana. At that time, she was advised that the water level in the spa should drop no more than two inches, and that the water temperature on the swimming side of the unit should not be as high as the temperature on the unit's spa side.

On October 14, 2010, an Aqua Haven employee traveled to Plaintiffs' residence to inspect and repair the water-level function and the temperature-control function under warranty. When Plaintiffs attempted to use the spa three days later, on October 17, 2010, they found that it made a humming sound, but its pumps were not emitting forced water from the side jets. Rachell Suhr immediately advised Aqua Haven of this latest failure. Plaintiffs allege that during this conversation, Rachell Suhr made a demand to cancel the contract, which Aqua Haven denies.

Upon learning of Plaintiffs' complaints, Aqua Haven contacted ServCo, The Spa Service Company, LLC ("ServCo"), and requested that its owner, Fenimore C. Blow, contact Plaintiffs about making repairs to the unit. Blow first contacted Plaintiffs on October 19, 2010. During a telephone conversation on that date, Blow indicated that he needed to inspect the unit to diagnose

all existing issues and to make necessary repairs. Rachell Suhr indicated that she would speak with her husband and call Blow back to schedule repairs, but Rachell Suhr did not return Blow's call. On November 2, 2010, Blow contacted Plaintiffs a second time and offered to repair and winterize the spa, but Plaintiffs declined any further repairs and told Blow that they were not going to use the spa anymore.

After declining any further repair efforts, Plaintiffs discontinued their use of the spa. Plaintiffs resolved not to replace the Master Spa swim spa with another similar unit and removed the spa from the structure that they had spent approximately $7,000.00 constructing for the unit. Plaintiffs then engaged their attorney, who notified Defendants that Plaintiffs wished to reject or to revoke acceptance of the spa. Defendants each refused rejection or revocation, and instead insisted that Plaintiffs afford them an opportunity to perform warranty repairs.

Master Spas's customer service manager, Ken Miller, inspected the unit on October 18, 2011. Miller observed minor issues with the spa, including valves and motor components in need of adjustment, and two LED lights that were not visible because they had been pulled from their lenses. The parties agree that all issues with the swim spa could be repaired in a single visit. Defendants assert that they remain ready, willing, and able to repair the swim spa under warranty.

## II.    Summary Judgment Standard

Summary judgment is appropriate if the moving party demonstrates that "there is no genuine dispute as to any material fact" and that it is "entitled to judgment as a matter of law."[11] "An issue of fact is 'genuine' if the evidence allows a reasonable jury to resolve the issue either

---

[11] Fed. R. Civ. P. 56(a).

way."[12]  A fact is "material" when "it is essential to the proper disposition of the claim."[13]  The Court views the evidence and all reasonable inferences in the light most favorable to the party opposing the motion for summary judgment under consideration.[14]

The moving party bears the initial burden of demonstrating the absence of a genuine issue of material fact.[15]  In attempting to meet this standard, the moving party need not disprove the nonmoving party's claim; rather, the movant must simply point out the lack of evidence on an essential element of the nonmoving party's claim.[16]  If the moving party carries its initial burden, the party opposing summary judgment cannot rest on the pleadings but must bring forth "specific facts showing a genuine issue for trial."[17]  The opposing party must "set forth specific facts that would be admissible in evidence in the event of trial from which a rational trier of fact could find for the nonmovant."[18]  "To accomplish this, the facts must be identified by reference to affidavits, deposition transcripts, or specific exhibits incorporated therein."[19]  Conclusory allegations alone are insufficient to defeat a properly supported motion for summary judgment.[20]

---

[12] *Haynes v. Level 3 Commc'ns, LLC*, 456 F.3d 1215, 1219 (10th Cir. 2006).

[13] *Id.*

[14] *LifeWise Master Funding v. Telebank*, 374 F.3d 917, 927 (10th Cir. 2004).

[15] *Thom v. Bristol-Myers Squibb Co.*, 353 F.3d 848, 851 (10th Cir. 2003) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986)).

[16] *Id.* (citing *Celotex*, 477 U.S. at 325).

[17] *Garrison v. Gambro, Inc.*, 428 F.3d 933, 935 (10th Cir. 2005).

[18] *Mitchell v. City of Moore, Okla.*, 218 F.3d 1190, 1197 (10th Cir. 2000) (citing *Adler v. Wal-Mart Stores, Inc.*, 144 F.3d 664, 670 (10th Cir. 1998)).

[19] *Adler*, 144 F.3d at 671.

[20] *White v. York Int'l Corp.*, 45 F.3d 357, 363 (10th Cir. 1995).

The nonmovant's "evidence, including testimony, must be based on more than mere speculation, conjecture, or surmise."[21]

Though the parties in this case filed cross-motions for summary judgment, the legal standard remains the same.[22]  Each party retains the burden of establishing the lack of a genuine issue of material fact and entitlement to judgment as a matter of law.[23]  Each motion will be considered separately.[24]  "To the extent the cross-motions overlap, however, the court may address the legal arguments together."[25]  Finally, summary judgment is not a "disfavored procedural shortcut," but it is an important procedure "designed to secure the just, speedy and inexpensive determination of every action."[26]

## III.     Analysis

### A.     Plaintiffs' Negligence Claims

Plaintiffs assert negligence claims against both Defendants.  According to Plaintiffs, Master Spas had a duty to construct the spa in a workmanlike manner, but breached that duty when it "failed to provide a well-constructed spa."[27]  Plaintiffs also allege that Aqua Haven negligently failed to make timely and effective repairs.  Defendants argue that summary judgment is appropriate under the economic loss doctrine.  The Court agrees.

---

[21] *Bones v. Honeywell Int'l, Inc.*, 366 F.3d 869, 875 (10th Cir. 2004).

[22] *City of Shawnee v. Argonaut Ins. Co.*, 546 F. Supp. 2d 1163, 1172 (D. Kan. 2008).

[23] *United Wats, Inc. v. Cincinnati Ins. Co.*, 971 F. Supp. 1375, 1381-82 (D. Kan. 1997) (citing *Houghton v. Foremost Fin. Servs. Corp.*, 724 F.2d 112, 114 (10th Cir.1983)).

[24] *Atl. Richfield Co. v. Farm Credit Bank of Wichita*, 226 F.3d 1138, 1148 (10th Cir. 2000).

[25] *Berges v. Standard Ins. Co.*, 704 F. Supp. 2d 1149, 1155 (D. Kan. 2010).

[26] *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1).

[27] Am. Compl., Doc 24, at 8; *see* Pretrial Order, Doc. 41, at 15.

Because Plaintiffs' negligence claim is supplemental to other claims arising under federal law, the Court applies the substantive law of Kansas, the state where the alleged negligence took place.[28]  Kansas courts have adopted the economic loss doctrine, which precludes a "purchaser of defective products from employing negligence or strict liability theories when the only injury is damage to the product itself."[29]  Accordingly, any problems with the spa's electrical or pumping functions arose from component parts that constitute the "product itself."[30]  The uncontroverted facts, reviewed in the light most favorable to Plaintiffs, fail to establish that Defendants' conduct damaged Plaintiffs or their property.  Plaintiffs claim they suffered property damage because the $7,000.00 structure that they built for the spa was abandoned and removed.  However, the uncontroverted facts demonstrate that Plaintiffs only abandoned and removed the structure after they decided to refuse any repairs and elected not to replace the spa unit.  Because Plaintiffs have not suffered personal or property damage as a result of Defendants' actions, the economic loss doctrine applies to preclude Plaintiffs' negligence claim.

**B.    Plaintiffs' Claims for Breach of Contract**

As an alternative to their claims for breach of express and implied warranty, Plaintiffs asserted claims for breach of contract against Master Spas and Aqua Haven.  Defendants seek summary judgment, arguing that Plaintiffs' breach of contract claims are duplicative of, and are therefore consumed by, Plaintiffs' breach of warranty claims under the Uniform Commercial Code.  The Court agrees.

---

[28] *Taylor v. Phelan*, 799 F. Supp. 1095, 1098 (D. Kan. 1992).

[29] *N.W. Ark. Masonry, Inc. v. Summit Specialty Prod., Inc.*, 31 P.3d 982, syl. 2 (Kan. Ct. App. 2001).

[30] *See Jordan v. Case Corp.*, 993 P.2d 650, 652 (Kan. Ct. App. 1999) (holding that an engine constitutes a component part of a combine and is subject to the economic loss doctrine).

It is well-established that a plaintiff may seek alternative theories of recovery, even when only one of those theories could actually prevail at trial.[31] For this reason, Plaintiffs assert that the Court must permit them to maintain their warranty and contract theories at this stage of the litigation. This flexibility may apply during the motion-to-dismiss stage, but it generally does not extend to the summary-judgment stage or beyond.[32] Indeed, this Court has granted summary judgment on claims for breach of contract when the underlying factual allegations and remedies are substantially the same as a plaintiff's claims for breach of warranty.[33]

The Pretrial Order in this case reveals that Plaintiffs' primary claims are for breach of warranty, and Plaintiffs' breach of contract claims share identical elements and remedies with their principal breach of warranty claims.[34] In fact, when stating the elements and proof required for their breach of contract claims, Plaintiffs expressly direct the Court to their statement of elements required for their warranty claims. Because Plaintiffs have failed to establish that their breach of contract claims are factually distinct from their breach of warranty claims, Defendants are entitled to summary judgment.[35]

## C.     Plaintiffs' Claims for Breach of Express Warranty

### 1.     Defendants' Alleged Express Warranties Regarding Timely Repairs

Plaintiffs allege that Defendants made and breached express warranties that they would respond to warranty issues within a reasonable time. Master Spas's written Limited Warranty

---

[31] *Huffman v. Saul Holdings Ltd. P'ship*, 194 F.3d 1072, 1081 (10th Cir. 1999); *Smith v. Cashland, Inc.*, 193 F.3d 1158, 1161 (10th Cir. 1999).

[32] *Lohmann & Rauscher, Inc. v. YKK (U.S.A.) Inc.*, 477 F. Supp. 2d 1147, 1152-53 (D. Kan. 2007).

[33] *Id.*

[34] Pretrial Order, Doc. 41, at 14-15 (stating the elements of Plaintiffs' breach of contract claims by exclusive reference to the elements for Plaintiffs' breach of warranty claims).

[35] *Lohmann*, 477 F. Supp. 2d at 1153.

provides, "Upon notice of warranty claim, the Master Spas dealer or an authorized representative of Master Spas will inspect the spa in a reasonable time after the initial notification to determine if the malfunction or failure is a covered malfunction or defect under this limited warranty."[36] Plaintiffs claim that Master Spas breached this warranty because it failed to inspect and repair issues for as many as ten weeks. Plaintiffs also claim that responsive warranty repairs were material in their decision to purchase the spa from an out-of-state dealer. Whether Defendants responded to service requests within a "reasonable time" is a question of fact for the jury.[37]

Plaintiffs also claim that Aqua Haven made and breached an express oral warranty that it would generally respond to warranty issues within two or three days. In support of this claim, Plaintiffs provide affidavit testimony that they were concerned about an Oklahoma dealer's ability to conduct warranty repairs, but completed the transaction because Gordon represented that Defendants would generally respond to warranty issues within several days. Defendants deny that Gordon made this representation or that such representation was material to Plaintiffs. Because the parties dispute whether Gordon made a representation concerning how quickly Defendants could respond to service requests, and because the parties dispute the materiality of such a representation to Plaintiffs, genuine issues of material fact preclude each party's motions for summary judgment on this portion of Plaintiffs' claim for breach of express warranty.

### 2. Defendants' Express Warranty Concerning Defects

Plaintiffs also assert claims against both Master Spas and Aqua Master for breach of express warranty. Master Spas provides a written Limited Warranty to spa purchasers, which provides that the spa's equipment will be free from defects in material and workmanship for a

---

[36] Master Spas Warranty, Pl.'s Ex. 8, Doc. 47-8, at 2.

[37] *See Mullan v. Quickie Aircraft Corp.*, 797 F.2d 845, 847 (10th Cir. 1986).

period of five years.  It is uncontroverted that Gordon, an Aqua Haven employee, gave Plaintiffs a copy of this warranty and generally conveyed its terms.

As a preliminary matter, Aqua Haven argues that it is entitled to summary judgment because it did not issue the express Limited Warranty to Plaintiffs, but instead merely conveyed the express warranty offered by Master Spas.  The Court agrees.  Rachell Suhr's testimony reveals that Gordon gave Plaintiffs an envelope containing a copy of the Master Spas Limited Warranty, but that Aqua Haven did not independently provide an express warranty.  While Plaintiffs argue that a dealer can be found to have adopted a manufacturer's express warranty, Plaintiffs fail to cite any binding authority for this proposition or to articulate any specific conduct by Aqua Haven that constitutes adoption of Master Spas' express warranty as a matter of law.  Accordingly, the Court grants Aqua Haven's motion for summary judgment on this claim and limits its analysis to Plaintiffs' claim against Master Spas.

### a.  The Limited Warranty is Not a Future Performance Warranty

The Court must ascertain the scope and content of Master Spas's Limited Warranty before it can determine whether its terms have been breached.  Plaintiffs characterize Master Spas's express warranty as one principally relating to the spa's future performance.  Under Kansas law, a warranty that guarantees the future performance of goods differs from a mere warranty to repair goods if necessary.[38]  Courts will recognize a future performance warranty under the proper circumstances,[39] but such characterization is very narrow, and any ambiguity in

---

[38] *Voth v. Chrysler Motor Corp.*, 545 P.2d 371, 374-75 (Kan. 1976).

[39] *Full Faith Church of Love W., Inc. v. Hoover Treated Wood Prods., Inc.*, 224 F. Supp. 2d 1285, 1292-93 (D. Kan. 2002).

warranty language should be interpreted against the existence of a future performance warranty.[40]

A future performance warranty exists when the warranty language concerns the quality or nature of the goods for a specific time in the future.[41]   Courts have found future performance warranties when reviewing language stating that goods "will be free of defects in materials or workmanship for 5 years."[42]   Because the Master Spas warranty provides that the spa's equipment will be free from defects for five years, Plaintiffs argue that its terms give rise to a future performance warranty.  The Court disagrees.

Plaintiffs' argument relies upon one sentence of the Limited Warranty in a vacuum, which fails to recognize a cardinal rule of construction requiring that courts read all terms of a document together.[43]   In a document entitled, *Limited* Warranty, Plaintiffs cannot reasonably ask the Court to enforce a one-sentence warranty provision without considering the limiting language that follows in the very same document.  In reading the Limited Warranty's provisions together, the Court follows the Kansas Supreme Court's approach in *Voth v. Chrysler Motor Corp.*[44]  In *Voth*, the defendant warranted a vehicle against defects in material and workmanship for twelve months.  However, the warranty in *Voth* also provided that "any part of this vehicle found

---

[40] *SMD Investments Ltd. v. Raytheon Aircraft Co.*, 2006 WL 580968, *5 (D. Kan. Mar. 8, 2006) (citing 4B Lary Lawrence, Lawrence's Anderson on the Uniform Commercial Code § 2–725:125 (3d ed 2001)).

[41] *Id.*

[42] *See Anderson v. Crestliner, Inc.*, 564 N.W. 2d 218 (Minn. App. 1997); *Grand Island Express v. Timpte Ind.*, 28 F.3d 73, 75 (8th Cir. 1994).

[43] *See, e.g., Time Warner Entm't Co., LP v. Everest Midwest Licensee, LLC.*, 381 F.3d 1039, 1044–45 (10th Cir. 2004).

[44] 545 P.2d 371, 378 (Kan. 1976).

defective under the conditions of this warranty will be repaired or replaced . . . ."[45]  Reading

these provisions together, the court in *Voth* refused to recognize a future performance warranty.[46]

Here, the Limited Warranty provides that the spa will be free from defects for five years.

However, like the warranty in *Voth*, the Limited Warranty contemplates and specifically

provides for the possibility that a malfunction or defect might occur during that time.  In such an

instance, the Limited Warranty provides that "Master Spas, through its dealer, or authorized

representative will repair or replace the covered item."[47]  "A typical warranty which requires that

the seller repair or replace defective parts found during the period of the warranty does not

warrant the product's future performance."[48]  Reading these terms together, and considering that

any ambiguity in warranty language should be interpreted against the existence of a future

performance warranty, the Court finds that the Limited Warranty in this case does not constitute

a future performance warranty.

### b.  Plaintiffs' Allegations of Breach of the Limited Warranty

Plaintiffs claim that three problems with their spa gave rise to violations of the Limited

Warranty, entitling them to reject or revoke acceptance of the spa.  First, Plaintiffs allege that the

Limited Warranty was breached when they discovered blown fuses on May 28, 2010.  However,

the Limited Warranty expressly excludes fuses from the spa's covered items.  Additionally, it is

uncontroverted that Defendants replaced the fuses on June 25, 2010, fully repairing the issue

long before Plaintiffs filed suit or sought rejection and revocation of acceptance.  Accordingly,

the Court finds that the fuse failure on May 28, 2010, does not constitute a warranty breach.

---

[45] *Id.*

[46] *Id.*

[47] *Id.*

[48] *SMD Investments*, 2006 WL 580968 at *5 (citing *Voth*, 545 P.2d at 377).

Second, Plaintiffs allege that the Limited Warranty was breached when two actuator pumps malfunctioned in August 2010, causing occasional changes in temperature and water levels. Again, however, it is uncontroverted that Defendants replaced these motors on October 14, 2010, fully repairing the issue prior to Plaintiffs' lawsuit or request to return the spa. The record reveals that Plaintiffs accepted these repairs and recognized that the spa was functioning to their satisfaction. A plaintiff cannot prevail on a claim for breach of warranty when a defendant has already made satisfactory repairs.[49] "Whether premised upon breach of warranty, rescission, or revocation of acceptance under the UCC, there is a common thread running through each of these cases which is entirely absent here: the seller in each case failed to remedy major defects in the [goods]. In none of the cases were repairs satisfactorily made."[50] Because Defendants fully repaired the second issue concerning the unit's actuator pumps, the Court finds that Defendants' breach of warranty claim fails with respect to that issue.

Plaintiffs' final allegation of warranty breach relates to their discovery on October 17, 2010, that water was not coming out of the spa's jets even though they could hear the pumps running. The record shows that upon receiving Plaintiff's complaint, Defendants immediately engaged Fenimore Blow of ServCo, who made multiple good-faith efforts to inspect, adjust, and winterize Plaintiffs' spa unit. Additionally, Master Spas's customer service manager, Ken Miller, ultimately inspected the spa and provided uncontroverted testimony that the unit's water pressure could be addressed in a single visit by making very minor adjustments.

The Limited Warranty in this case provides that Plaintiffs' spa will be free from certain defects for a period of five years, and that any covered defects will be remedied by repair or

---

[49] *See McGilbray v. Scholfield Winnebago, Inc.*, 561 P.2d 832, 836 (Kan. 1977). (holding that rejection and revocation of acceptance were unavailable when a seller satisfactorily repaired the product).

[50] *Id.*

replacement. Plaintiffs have failed to demonstrate that the necessary adjustments related to Plaintiffs' third complaint arise from a defect in material or workmanship covered under the warranty. Further, the Kansas Supreme Court has held that a consumer may not return a complex product after extensive use simply because it requires repair under warranty.[51] Construing all facts in the light most favorable to Plaintiffs, the Court finds that Master Spas fulfilled its obligations by doing everything within its power to inspect the spa and to provide repairs or replacements under the warranty. Indeed, at all times Master Spas stood ready, willing, and able to conduct any necessary repairs in accordance with its warranty obligations. Accordingly, Defendants are entitled to summary judgment on Plaintiffs' claims for breach of the express Limited Warranty.

**D.    Plaintiffs' Claims for Breach of the Implied Warranty of Merchantability**

Plaintiffs assert that both Defendants violated an implied warranty of merchantability. As a preliminary matter, Master Spas argues that Plaintiffs' claim against it fails as a matter of law due to a lack of privity. This Court evaluated and rejected this position in *Gonzalez v. Pepsico, Inc.*[52] "Under Kansas law, an implied warranty of merchantability arises by operation of law under Article II of the UCC, which 'sets limits on who may assert breach of implied warranty claims.' "[53] The Kansas Supreme Court has historically held that the implied warranty of merchantability "[is] not extended to a remote seller or manufacturer of an allegedly defective product, which is not inherently dangerous, for only economic loss suffered by a buyer who is not in contractual privity with the remote seller or manufacturer."[54] However, privity

---

[51] *See id.*

[52] 489 F. Supp. 2d 1233 (D. Kan. 2007).

[53] *Id.* at 1243 (citing *Limestone Farms, Inc. v. Deere & Co.*, 29 P.3d 457, 461 (Kan. Ct. App. 2001)).

[54] *Id.* (citing *Prof'l Lens Plan, Inc. v. Polaris Leasing Corp.*, 675 P.2d 887, 898-99 (Kan. 1984)).

requirements for individual consumers' breach warranty claims under the UCC changed with the enactment of the KCPA,[55] which provides, "no action for breach of warranty with respect to property subject to a consumer transaction shall fail because of a lack of privity between the claimant and the party against whom the claim is made."[56] Therefore, Plaintiffs' implied warranty claim against Master Spas does not fail for lack of privity.

Nonetheless, the Court grants Defendants' motion for summary judgment for two reasons. First, the Court finds that Plaintiffs' implied warranty claim fails under *McGilbray* for the same reasons articulated in the Court's analysis of express warranties. Like the defendant in *McGilbray*, Defendants fully repaired any and every issue that Plaintiffs experienced, and Defendants stood ready, willing, and able to conduct good-faith repairs.

Second, the two-page Limited Warranty in this case includes a large, boldfaced, and italicized paragraph heading entitled, "Disclaimers."[57] This paragraph provides that "THIS LIMITED WARRANTY SPECIFICALLY EXCLUDES ANY AND ALL IMPLIED WARRANTIES OF MERCHANTABILITY AND/OR FITNESS FOR A PARTICULAR PURPOSE . . . ."[58] Kansas law permits the disclaimer of implied warranties.[59] To disclaim the implied warranty of merchantability, the Kansas Uniform Commercial Code requires that the language must mention merchantability and must be done in a conspicuous manner.[60] A

---

[55] *Id.*

[56] Kan. Stat. Ann. § 50-639(b). The Court notes that this exception to the privity requirement only applies to a "consumer" as defined by the KCPA, including "an individual, husband and wife, sole proprietor, or family partnership . . . ." Kan. Stat. Ann. § 50-624(b).

[57] Master Spas Warranty, Pl.'s Ex. 8, Doc. 47-8, at 2.

[58] *Id.* (emphasis in original).

[59] *City of Winfield, Kan. v. Key Equip. & Supply Co.*, 2013 WL 557181, *1 (D. Kan. Feb. 13, 2013) (citing Kan. Stat. Ann. § 84–2–316).

[60] *Id.*

disclaimer is sufficiently conspicuous if it has a heading that is larger than the surrounding text in contrasting font and if the disclaimer language differs from surrounding text by contrasting type, font, or color.[61]   Because the Limited Warranty's disclaimer had a large and italicized heading and substantial capitalized typeface expressly excluding the implied warranty of merchantability, the Court finds the disclaimer sufficiently conspicuous and clear to preclude Plaintiffs' claims against Master Spas.  The same holds for Aqua Haven because the form that Rachell Suhr signed upon delivery contains Terms and Conditions limiting its obligations to the terms of the manufacturer's warranty, including its disclaimer language.[62]

**E.     Plaintiffs' Request for Rejection and/or Revocation of Acceptance**

As a remedy for Defendants' alleged breach of express and implied warranties, Plaintiffs argue that they are entitled to reject or revoke acceptance of the spa.  As set forth above, the Court grants Defendants summary judgment on part of Plaintiffs' express and implied warranty claims, but denies the parties' motions for summary judgment on Plaintiffs' claims for breach of express warranty concerning timely repairs.  Because Plaintiffs' request for rejection and/or revocation of acceptance constitutes a central feature and aim of their claims, the Court will address Plaintiffs' entitlement to each.

**1.   Rejection is Inappropriate Because Plaintiffs Accepted the Spa**

Defendants argue that rejection is improper because Plaintiffs accepted the spa upon delivery.  The Court agrees.  "Acceptance of goods by the buyer precludes rejection of the goods accepted . . . ."[63]  "Rejection of goods must be within a reasonable time after their delivery or tender,"[64] and the Uniform Commercial Code provides that acceptance occurs when the buyer:

---

[61] *Id.*

[62] Order Form, Pl.'s Ex. 3, Doc. 47-3, at 2.

(a) after a reasonable opportunity to inspect the goods signifies to the seller that the goods are conforming or that he will take or retain them in spite of their nonconformity; or

(b) fails to make an effective rejection (subsection (1) of section 84-2-602), but such acceptance does not occur until the buyer has had a reasonable opportunity to inspect them; or

(c) does any act inconsistent with the seller's ownership; but if such act is wrongful as against the seller it is an acceptance only if ratified by him.[65]

In this case, it is uncontroverted that Defendants delivered the spa to Plaintiffs on April 14, 2010. On that date, Plaintiffs received delivery of the spa and Rachell Suhr signed the original sales form on a line next to the words, "Received by."[66] The terms and conditions on that sales form provide that "[d]elivery of the spa constitutes acceptance of the spa . . . ."[67] Plaintiffs then proceeded to install and use the spa extensively for several weeks. When issues arose in May and August of 2010, Plaintiffs did not attempt to reject the spa and Defendants made successful repairs to the units fuses and actuator pumps. Plaintiffs used that spa regularly and made no attempt to reject the unit until October 17, 2010, more than six months after delivery.

The Court finds that Plaintiffs are not entitled to rejection under these facts. Plaintiffs' receipt, installation, and extended use of the spa for six months collectively constitute acts inconsistent with Defendants' ownership. Further, Plaintiffs' acceptance is further evidenced by

---

[63] Kan. Stat. Ann. § 84-4-607(2).

[64] Kan. Stat. Ann. § 84-2-602.

[65] Kan. Stat. Ann. § 84-2-606.

[66] *Id.*

[67] Sales Contract, Pl.'s Ex. 3, Doc. 47-3, at 3. The Court recognizes that before this time, Plaintiffs had not signed the line of the order form designated for "Buyer." However, the Court notes that Plaintiffs are in fact the buyers with respect to the spa, and that their signature on the line designated "Received by" falls just below the order form's statement, "By signing the buyer accepts all terms and conditions stated on the front and back of this agreement."

the fact that they retained ownership and permitted repairs when problems arose.[68]   Because

Plaintiffs accepted the spa, they are precluded from obtaining the remedy of rejection.

### 2. Revocation of Acceptance is Inappropriate

In addition to their request for rejection, Plaintiffs alternatively seek to revoke acceptance

of the spa.  Master Spas first argues that Plaintiffs' revocation claim fails against it as a matter of

law due to a lack of privity.  The Court agrees.  While privity of contract is not necessary to

assert warranty claims against a manufacturer,[69] this Court has recognized that privity of contract

*is* required to revoke acceptance under Kansas law.[70]  "In Kansas, 'revocation of acceptance is a

remedy which allows a buyer to get rid of defective goods by returning them to the seller.' "[71]

The policies and commercial practices that support revocation against a dealer do not support

revocation against a manufacturer.[72]  Simply put, Plaintiffs' "revocation claim against the remote

manufacturer fails as a matter of law."[73]

Aqua Haven and Master Spas also argue that revocation of acceptance is improper under

*McGilbray v. Scholfield Winnebago, Inc.*[74]  In *McGilbray*, the plaintiff sought to revoke

acceptance of a motor home that required sixteen repairs within the first year.[75]  The defendant

performed successful repairs to each problem it was given the opportunity to address, and the

---

[68] *See Linscott v. Smith*, 581 P.2d 1271, 1274 (Kan. Ct. App. 1978).

[69] *Gonzalez*, 489 F. Supp. 2d at 1243.

[70] *AG Connection Sales, Inc. v. Greene County Motor Co.*, 2008 WL 4329941, *4-5 (D. Kan. Sept. 16, 2008).

[71] *Id.* at 5 (quoting *Newmaster v. S.E. Equip., Inc.*, 646 P.2d 488, 490 (Kan. 1982)).

[72] *Id.*

[73] *Id.*

[74] 561 P.2d 832 (Kan. 1977).

[75] *Id.* at 833.

motor home was generally serviceable and in use.[76]  Though several minor adjustments were necessary when plaintiff returned the motor home, there was no evidence that the defendant refused to address them.[77]  Because the defendant in *McGilbray* either repaired or stood ready to repair all issues, the Kansas Supreme Court held that revocation of acceptance was inappropriate.[78]

The facts in this case are similar to those in *McGilbray*.  Here, Plaintiffs experienced far fewer issues with their spa than the *McGilbray* plaintiff experienced with his motor home.  As noted above, Plaintiffs' first issue concerned the spa's fuses, which were expressly excluded from coverage under the warranty.  Nonetheless, Defendants replaced the fuses and the spa functioned properly.  Likewise, Defendants fully replaced and repaired the spa's actuator pumps, after which the spa performed properly and to Plaintiffs' satisfaction.  Defendants fulfilled their warranty obligations in every instance when given the opportunity.

With respect to Plaintiffs' last complaint concerning water pressure from the spa's jets, Defendants immediately engaged Fenimore Blow of ServCo to diagnose and conduct any necessary repairs.  Blow promptly and diligently made multiple good-faith attempts to inspect and repair Plaintiffs' spa, but his attempts were ignored and ultimately rejected.  Miller testified that only minor adjustments were necessary, and that Defendants could have successfully completed any minor repairs with a single visit.  In short, Defendants stood ready, willing, and able to repair the only remaining issue with Plaintiffs' spa, and Plaintiffs refused.  Plaintiffs' attempt to revoke acceptance under these circumstances violates the spirit and underlying

---

[76] *Id.* at 837.

[77] *Id.*

[78] *Id.*

purposes of the Uniform Commercial Code to avoid economic waste and to promote cooperative efforts to cure.[79]   Therefore, Plaintiffs are not entitled to revocation of acceptance.

**F.      Plaintiffs' Claims Under the Magnuson Moss Warranty Act**

Plaintiffs assert claims against Defendants under the Magnuson-Moss Warranty Act.[80] That Act provides that "a consumer who is damaged by the failure of a supplier, warrantor, or service contractor to comply with any obligation under this chapter, or under a written warranty, implied warranty, or service contract, may bring suit for damages and other legal and equitable relief . . . ."[81] The parties agree that Plaintiffs' Magnuson-Moss claims "stand or fall with their express and implied warranty claims under state law."[82]   Because the Court grants Defendants summary judgment on Plaintiffs' claims for breach of implied warranty and breach of express warranty concerning defects, Plaintiffs' corresponding Magnuson-Moss claims also fail. However, because the Court denied summary judgment on Plaintiffs' claim for breach of express warranty concerning timely repairs, the Court denies Defendants' motions for summary judgment on Plaintiffs' Magnuson-Moss claims.

**G.      Plaintiffs' KCPA Claims**

The KCPA provides that "[n]o supplier shall engage in any deceptive act or practice in connection with a consumer transaction."[83]   Under this provision, "consumer transaction" is limited to "a sale, lease, assignment or other disposition for value of property or services within

---

[79] *See Hemmert Agr. Aviation, Inc. v. Mid-Continent Aircraft Corp.*, 663 F. Supp. 1546, 1551 (D. Kan. 1987); James J. White & Robert S. Summers, Uniform Commercial Code, § 9:23 (6th ed. 2012).

[80] 15 U.S.C. § 2301, *et seq.*

[81] 15 U.S.C. § 2310(d).

[82]   *Clemens v. DaimlerChrysler Corp.*, 534 F.3d 1017, 1022 (9th Cir. 2008); *Schimmer v. Jaguar Cars, Inc.*, 384 F.3d 402, 405 (7th Cir. 2004); *Daniel v. Ford Motor Co.*, 2013 WL 2474934, * 11 (E.D. Cal. June 7, 2013); *see Salter v. Al-Hallaq*, 2003 WL 1872991, *2 (D. Kan. Apr. 10, 2003).

[83] Kan. Stat. Ann. § 50-626 (a).

this state . . . ."[84] As a preliminary matter, Defendants argue that the KCPA is inapplicable because the subject transaction occurred in Oklahoma and Texas. The Court disagrees. Courts liberally construe the KCPA to protect consumers against deceptive practices *in connection* with a transaction,[85] which extends beyond the sale to include subsequent warranty service provided in relation with the sale. Here, because Defendants provided warranty service to Plaintiffs' spa in Kansas in direct connection with the commercial sale, the Court finds that the KCPA applies.

Plaintiffs assert four independent bases for their allegation that Defendants engaged in deceptive conduct. First, Plaintiffs allege that Aqua Haven made representations to the Court that Plaintiffs declined to allow ServCo to attempt repairs after reporting a problem on October 17, 2010. Under the KCPA, an alleged deceptive act must be material to the transaction.[86] Because Aqua Haven's representation that Plaintiffs declined ServCo's repairs came *after* Plaintiffs had already sought revocation of acceptance, the Court finds Plaintiff's first allegation insufficient to support their KCPA claim.

Second, Plaintiffs allege that Aqua Haven employee, Ryan Frank, told Plaintiffs that they were legally prohibited from pursuing or obtaining cancellation of the contract. Ryan Frank allegedly made this statement during a telephone conversation with Lyle Suhr. However, Lyle Suhr testified that he did not actually remember Ryan Frank making such a statement. Rachell Suhr testified that Lyle Suhr conveyed the statement that Plaintiffs now attribute to Ryan Frank, but because she did not hear the conversation, her testimony constitutes inadmissible hearsay.[87] Accordingly, Plaintiffs' second basis also fails to support their KCPA claims.

---

[84] Kan. Stat. Ann. § 50-624(c).

[85] Kan. Stat. Ann. § 50-623(b).

[86] *In re Motor Fuel Temperature Sales Practices Litig., MDL 1840*, 2012 WL 3611010, fn. 9 (D. Kan. Aug. 22, 2012).

Third, Plaintiffs argue that Aqua Haven made a misrepresentation when it told them that there was no mechanical deficiency in the water jet operation when the spa's jets did not emit pressurized water. However, as noted above, Miller inspected Plaintiffs' spa on October 18, 2011, and testified that all issues could be resolved in one visit with very minor adjustments. Because Plaintiffs have not controverted Miller's sworn testimony, the Court finds that Aqua Haven's statement was true, and therefore, not a misrepresentation.

Fourth and finally, Plaintiffs allege that Defendants misrepresented their response time for warranty repairs. Plaintiffs' affidavit testimony suggests that Gordon represented that Defendants would generally respond to warranty issues within several days. Defendants deny that Gordon made this representation and deny that such representation was material to Plaintiffs. Because the parties dispute whether Gordon made a representation concerning how quickly Defendants could respond to service requests, and because the parties dispute the materiality of such a representation to Plaintiffs, genuine issues of material fact that preclude each party's motions for summary judgment on this portion of Plaintiffs' KCPA claims.

**IT IS ACCORDINGLY ORDERED** that Plaintiffs' Motion for Summary Judgment (Doc. 46) is **DENIED**.

**IT IS FURTHER ORDERED** that Master Spas, Inc.'s Motion for Summary Judgment (Doc. 42) is **GRANTED** with respect to Plaintiffs' claims for breach of express warranty regarding defects, breach of implied warranty, breach of contract, rejection, revocation of acceptance, and negligence. Master Spas, Inc's Motion for Summary Judgment is **DENIED** with respect to Plaintiffs' claims for breach of express warranty concerning timely repairs, violation of the Magnuson-Moss Warranty Act, and violation of the Kansas Consumer Protection Act.

---

[87] *See* Fed. R. Evid. 801.

**IT IS FURTHER ORDERED** that Aqua Haven, LLC's Motion for Summary Judgment (Doc. 44) is **GRANTED** with respect to Plaintiffs' claims for breach of express warranty regarding defects, breach of implied warranty, breach of contract, rejection, revocation of acceptance, and negligence. Aqua Haven, LLC's Motion for Summary Judgment is **DENIED** with respect to Plaintiffs' claims for breach of express warranty concerning timely repairs, violation of the Magnuson-Moss Warranty Act, and violation of the Kansas Consumer Protection Act.

**IT IS SO ORDERED**.

Dated this 18th day of July, 2013.

ERIC F. MELGREN
UNITED STATES DISTRICT JUDGE